UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
SECURITIES AND EXCHANGE
COMMISSION,                         :

       Plaintiff,         :     **MEMORANDUM & ORDER**

    -against-               :     **11 Cv. 4642 (MHD)**

JOSHUA CONSTANTIN et al.,          :

     Defendants.         :
--------------------------------x

**MICHAEL H. DOLINGER, U.S.M.J.:**


The Securities and Exchange Commission ("SEC") brought this civil enforcement action against defendants Joshua Constantin, Brian Solomon, and Windham Securities, Inc.,[1] alleging that the defendant broker-dealers misled clients about their professional experience and qualifications, misappropriated client funds, and knowingly prepared false account statements to cover up their fraud, all in violation of § 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), and § 10(b) the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b). For relief, plaintiff seeks a permanent injunction proscribing defendants' future violation of the federal

---

[1] The SEC has also named as relief defendants two corporations, Constantin Resource Group, Inc. ("Constantin Resource") and Domestic Applications Corp. ("DAC"). It alleges that each received assets derived from defendants' securities fraud. (Compl.).

securities laws, imposition of maximum civil penalties, and an order directing defendants and relief defendants to disgorge all ill-gotten gains from defendants' misconduct. (See Pl.'s Mem. 65).

Following expiration of the discovery period, the SEC has moved for summary judgment. Defendants have not opposed.

### THE FACTUAL RECORD

In summarizing the record on plaintiff's motion, we rely on those facts stated in the SEC's Rule 56.1 statement insofar as they are supported by some proffered evidence. To the extent that the SEC has providing competent evidence, those facts are deemed not to be in dispute, since defendants have offered no contradiction.

In late 2005, Constantin Resource Group, Inc., a company wholly-owned and controlled by Joshua Constantin ("Constantin") (see Kamar Decl. Ex. 1 at 21), acquired Windham Securities, Inc. ("Windham"), a small, SEC-registered broker-dealer based in Long Island, New York. (Pl.'s Rule 56.1 Statement ¶¶ 5, 22, 46; Kamar Decl. Ex. 1 at 26, Ex. 3 at 14-15, Ex. 14 at 6).

Windham is an introducing broker whose trades and client accounts were managed by two clearing brokers, Penson Clearing Services and, for a period during 2008, LEK Securities Inc. (Pl.'s Rule 56.1 Statement ¶¶ 65-66, 69; Kamar Decl. Ex. 14 at 6). As a "nickel broker-dealer,"[2] Windham is not permitted to carry accounts, or to receive or hold funds or securities for its customers. See 17 C.F.R. § 240.15c3-1(a)(1), (a)(2)(iv); Fin. Indus. Regulatory Auth., SEA Rule 15c3-1(a)(2)(iv) (2008); (see also Pl.'s Rule 56.1 Statement ¶¶ 62-64).

From 2005 through 2009, Constantin served as Windham's chief executive officer ("CEO"), managing director, and registered representative. (Pl.'s Rule 56.1 Statement ¶ 6). Brian Solomon joined Windham in November 2006, as the "fixed income director," and in July 2007 became a registered representative of the company. (Kamar Decl. Ex. 4 at 57-58; Pl.'s Rule 56.1 Statement ¶ 33). Between July 2007 and approximately January 2009, Windham's staff was essentially

---

[2] A "nickel broker-dealer" is required to maintain a minimum net capital of $5,000.00, and a ratio of aggregate-indebtedness-to-net-capital of no more than fifteen-to-one. Fin. Indus. Regulatory Auth., SEA Rule 15c3-1(a)(2)(iv) (2008); (see Kamar Decl. Ex. 14 at 8).

comprised of Constantin and Solomon, plus an outside compliance officer.[3] (Kamar Decl. Ex. 1 at 27, Ex. 2 at 27).

Constantin oversaw general office operations, wrote all of Windham's agreements, and managed all of the company's business through its associated clearing firms. (Id. at Ex. 4 pp. 137-38). He also was responsible for supervising Solomon, and overseeing and approving all of the transactions and accounts for Solomon's clients. (Pl.'s Rule 56.1 Statement ¶ 40; Kamar Decl. Ex. 4 at 133, 137). Solomon's job responsibilities included "bring[ing] clients to Windham, open[ing] accounts, do[ing] trades and transactions… mostly trying to raise money and find the specific type of investments for clients." (Kamar Decl. Ex. 4 at 90). Solomon targeted clients who were "individual investors… of a high net worth." (Id.). His job title at the small company apparently was not fixed and varied as needed, depending on his interactions with clients. (See id. at Ex. 2 pp. 27, 177 (Solomon testified "I was whatever I needed to be in order to complete the task at hand.")).

The image of Windham that Constantin and Solomon promoted to their clients was very different from the true nature of the

---

[3] For a period in 2008, Windham also had a trading representative, based in Florida. (Kamar Decl. Ex. 2 at 81, Ex. 4 at 183).

company. In practice, Constantin worked out of a small office in Long Island, New York,[4] while Solomon worked primarily out of his home in Santa Monica, California, and occasionally from a temporary office space in Los Angeles. (Pl.'s Rule 56.1 Statement ¶¶ 46-47, 52; Kamar Decl. Ex. 4 at 100, 104, 107, 119-20). During the period from approximately 2008 to May 2010, Windham managed accounts for a client base of approximately eight individuals. (See Kamar Decl. Ex. 1 at 182). However, Windham promoted itself as a large, international company. The company's letterhead, website, marketing materials, and business cards listed offices on Park Avenue in Manhattan, Santa Monica Boulevard in Los Angeles, and the Champs-Elysées in Paris, in addition to the office in Long Island, New York. (Pl.'s Rule 56.1 Statement at ¶ 57; Kamar Decl. Exs. 15, 25, 29). The first three of these offices were actually "virtual" office spaces, which Windham had contracted to use for the receipt of mail and as occasional meeting spaces, and which were temporary spaces, shared with other corporate entities. (Pl.'s Rule 56.1 Statement ¶¶ 57-59; Kamar Decl. Ex. 9 at 112-18). While Constantin and Solomon made occasional use of the Manhattan and Los Angeles offices, neither office served as a center for Windham's

---

[4] The record suggests that Windham changed the location of its main office several times; however, Constantin apparently conducted business primarily from Long Island or from Manhattan. (See, e.g., Kamar Decl. Ex. 9 at 111-116).

operations, and no one from Windham had ever conducted any business out of the purported office in Paris. (Kamar Decl. Ex. 9 at 114, 116). In addition, between late 2007 and mid-2008, Windham began operating a website with the French domain name "www.windham.fr," and Constantin and Solomon began sending emails from accounts ending in "@windham.fr." (Pl.'s Rule 56.1 Statement ¶¶ 58, 60).

On numerous occasions, Solomon lied to clients about his involvement in foreign markets, indicating, for example, that he was leaving on a business trip to Hong Kong (Kamar Decl. Ex. 46), and that he "often work[ed] the European open" (id. at Ex. 70), when in fact neither was true. (Id. at Ex. 2 p. 74, Ex. 4 p. 153; see also id. at Ex. 6 p. 17 (client testified that Solomon had boasted that his experience "went back to his workings in Europe, where he had done [investment deals] before.")).

Although Constantin and Solomon had both dropped out of college and neither had received degrees (Pl.'s Rule 56.1 Statement ¶¶ 1, 2, 13; Kamar Decl. Ex. 6 at 13, Ex. 18 at 6, Ex. 19), they each suggested to their clients and potential investors that they had graduated with degrees from well-respected schools. (Kamar Decl. Ex. 4 at 190-91 (discussing

Solomon's attendance at Dartmouth College), Ex. 15 (claiming
Constantin "has an undergraduate degree in Economics from
Fordham University where he also did his graduate work")).

Solomon frequently misrepresented Windham's investment
experience and prior performance to potential investors. For
example, he advised one client that he had previously worked
with small companies and had "brought them to market." (Id. at
Ex. 6 p. 17). He wrote to another client,

> As an example of our track record, please
> review the following IPO's that over the
> past year we have participated in the
> syndicates… Looking at these shows you that
> what we do is tangible (tangible =
> transactions with results you can verify).

(Id. at Ex. 70). Solomon then proceeded in the same email to
list six company stocks in a chart comparing the companies'
stock prices at the time of public offering and as of the date
of Solomon's email. (Id.). In fact, no one at Wyndham had
participated in any of those syndicates or, for that matter, had
ever successfully taken a private company public. (See id. at
Ex. 1 pp. 190, 192, 195, Ex. 4 p. 24). Solomon also told clients
that Windham had "a floor of traders in New York" (id. at Ex. 7
p. 234), when, in fact, at the time the company did not. (Pl.'s
Rule 56.1 Statement ¶¶ 221-22).

7

Constantin and Solomon promised, and otherwise encouraged clients to believe, that they could expect unreasonably large and rapid returns on their investments through Windham. (Compare Kamar Decl. Ex. 34 (Solomon suggests to client that Windham could deliver a 400% to 500% return on investment) and Ex. 35 (Solomon writes to a potential client "Investments do not wait, and we need to meet certain deadline [sic] to maintain our 500% [return] goal… If we do not hear any response from you by Tuesday, we will withdraw, close your account and be unavailable to you in the future.") with id. at Ex. 5 pp. 526, 532 (Solomon testifies "You know, I can't say that Windham had 500 percent historical returns."); see also id. at Ex. 72 (Solomon encourages client to expect a "fast profitable return."). Constantin reinforced Solomon's rosy projections, advising clients that they would be able to liquidate their investments many months before they actually ended up being able to do so (see, e.g., id. at Exs. 79, 80, 82), and promising very high returns. (See id. at Ex. 84 ("I expect the results of this transaction when completed to be nothing short of stellar and even taking into account the extra time the internal rate of return on this investment should be off the charts")). In one case, Constantin cited to a client, as a company's purported book value, a figure that was more than seven times the actual book value that he knew the company to have. (Compare id. at Ex.

8

84 p. 90 (Constantin quotes book value of "$22-$33 million")
with Ex. 85 p. 1 (actual book value listed as "$3-$4.5
million")).

The SEC's complaint and motion papers highlight the stories
of two Windham clients, Dr. Charles Balaban and Mr. Edward Mier-
Jedrzejowicz ("Mier"), as exemplars of Windham's fraudulent
investment scheme. Defendants apparently defrauded at least five
additional Windham clients between 2008 and 2009. (See Pl.'s
Rule 56.1 Statement ¶¶ 306-19).

**Dr. Balaban**

Dr. Charles Balaban was referred to Solomon as a potential
client in May 2008. (Id. at ¶ 72). At the time, Balaban, a
Canadian citizen and resident, was looking to invest $1 million
of the proceeds he had received from the sale of his dental
practice (id. at ¶¶ 74, 101) and informed Solomon that he was
looking for an investment that would yield liquid profits in
approximately one year. (Id. at ¶ 80). Solomon advised Balaban
that he could earn a 200 percent annual return at Windham. (Id.
at ¶ 83). Solomon also told Balaban that he had prior experience
working with discounted securities (id. at ¶ 86), though Solomon
later testified at his deposition that he had only ever managed

9

to purchase discounted debt securities and had never actually succeeded in reselling them for a return on his investment. (Kamar Decl. Ex. 4 at 188-89).

On May 21, 2008, Solomon attempted to open an account for Balaban with Penson Clearing Services, but was told that Penson did "not allow accounts to have Canadian mailing addresses." (Id. at Ex. 39 p. 2; Pl.'s Rule 56.1 Statement ¶ 98). Solomon emailed Penson a new application package, indicating that Balaban held additional property in the United States and that his account statements should, accordingly, be sent to an address in Santa Monica, California. (Pl.'s Rule 56.1 Statement ¶ 99; Kamar Decl. Ex. 39). That address, which Solomon had suggested to Penson belonged to Balaban, in fact belonged to Solomon. (Pl.'s Rule 56.1 Statement ¶ 100).

Balaban deposited $1 million into his new Penson account on June 5, 2008. (Id. at ¶ 101). Soon thereafter, Constantin transferred $100,000.00 out of the account -- $50,000.00 of which he transferred to Solomon and another $50,000.00 of which he transferred to Constantin Resource -- as Windham's purported ten-percent advisory fee. (Id. at ¶¶ 102-103). Balaban later testified that he had not considered the ten-percent fee to be

reasonable and, in any event, "it hadn't been discussed originally." (Kamar Decl. Ex. 6 at 31).

Constantin invested some of Balaban's remaining funds in the purchase of 200,000 shares of common stock in a company called Omega World. (Id. at Ex. 6 p. 40). As of about June 27, 2008, Balaban's Penson account reflected a cash balance of approximately $670,000.00, plus the 200,000 shares in Omega World. (Id.).[5]

Solomon next advised Balaban of a potential investment opportunity in Leeward, a private insurance company that Windham was purportedly helping to take public through a reverse merger process.[6] (Pl.'s Rule 56.1 Statement ¶¶ 108-110). On July 7,

---

[5] It is unclear exactly how much of Balaban's funds Windham invested in the purchase of Omega World stock. While there is some indication that the 200,000 shares were valued at $1.50 per share and were purchased for a total of $300,000 (see, e.g., Kamar Decl. Ex 6 at 40, Ex. 47), there is other evidence suggesting that the stocks were acquired at less than market value for $1.00 per share. (See id. at Ex. 4 pp. 200-01). If the shares were purchased for $1.00 per share, for a total of $200,000, this would leave approximately $30,000 of Balaban's $1 million investment unaccounted for, after taking into account the cash balance as of June 2008 and the Windham fee.  If, however, the shares had been purchased at $1.50 per share, for a total of $300,000, there would be an excess of $70,000 in value over and above Balaban's initial $1 million investment that would seem to have appeared out of nowhere.
[6] There is some ambiguity as to what Solomon initially told Balaban about the Leeward deal. (Compare Kamar Decl. Ex. 4 at 216-17 (Solomon claims he gave Balaban only an "elevator pitch"

2008, Constantin transferred $600,000.00 from Balaban's Penson account into an escrow account that Windham had established for the Leeward deal. (Pl.'s Rule 56.1 Statement ¶¶ 119, 121, 125).[7] The next day, Constantin wired $150,000.00 out of the Leeward escrow account to Constantin Resource.[8] (Id. at ¶ 122). He wired another $250,000.00 from the escrow account to Leeward, purportedly for the purchase of Leeward stock in the name of DAC. (Id.). On July 17, 2008, Constantin transferred another $175,000.00 from the Leeward escrow account to Constantin Resource. (Id. at ¶ 124). Then, on July 22, 2008, Constantin transferred another $60,000.00 from Balaban's Penson account to the Leeward escrow account, from which he then transferred $84,000.00 to Constantin Resource on July 24, 2008. (Id. at ¶¶ 126-27). On October 30, 2008, Constantin transferred the balance of Balaban's funds from his Penson account -- $9,715.78 -- straight into Windham's checking account. (Id. at ¶ 129). In return for each of these transfers of funds, Balaban apparently

---

and advised him to speak further with Constantin) with Ex. 6 at 62, 81 (Balaban claims that he was never told about Leeward before his money was invested in the company, and that he never spoke to Constantin before 2009)).

[7] As noted, there is some indication that Balaban's funds were invested in Leeward without his prior approval. (Kamar Decl. Ex. 6 at 48).

[8] Constantin testified that he controlled the Leeward escrow account together with an attorney, Jesse Erwin, Esq. (Kamar Decl. Ex. 1 at 17-18, 35).

received no stock and no other form of material benefit from any of the recipients of his funds.

Penson mailed Balaban's account statements to the designated address in Santa Monica, California, which, as noted, belonged to Solomon. (Id. at ¶ 130). Solomon reviewed Balaban's Penson account statements but did not forward them to Balaban or notify Balaban of their contents, including the fact that, by July 2008, Balaban's Penson account had a cash balance of less than $10,000.00 and reflected no securities holdings or purchases. (See id. at ¶¶ 131-34).

On August 11, 2008, Constantin emailed Solomon an account statement showing 200,000 shares of Omega World stock held by LEK Securities, Inc. in Balaban's name. Solomon forwarded that account statement to Balaban (id. at ¶ 136) and indicated, "You have a second position now Leeward (the NY insurance company.) That stock is not showing in this account yet. As was the case with Omega World, it takes some time for the new stock to settle in the account." (Id. at ¶ 137).

In late August 2008, Balaban notified Solomon that he had not been receiving monthly account statements. (Id. at ¶ 139). Although Balaban completed a form titled "Consent to Electronic

13

Delivery of Documents" that Solomon had provided to him, and although Solomon regularly accessed and reviewed Balaban's accounts online, Balaban was never given online access to his Penson or LEK account statements. In addition, Solomon did not forward any of Balaban's paper Penson account statements to Balaban at his Canadian address. (See id. at ¶¶ 141-143).

Instead, at Constantin's direction, Solomon created an account statement for Balaban under Windham's logo.[9] The August 2008 Windham statement reflected a purported total account value of $1,019,740.00, including the following holdings, listed as "equities": 200,000 shares of Omega World stock and a $660,000.00 "Pre-IPO Promissory Note" in Leeward Corp. (Id. at ¶¶ 151, 162). Solomon and Constantin prepared a similar account statement for Balaban for September 2008, reflecting a purported total value of $1,039,740.00, an increase of exactly $20,000.00 from the previous month's statement. (Id. at ¶ 153). Despite their representation to Balaban that his account held Leeward securities, Constantin and Solomon knew that Balaban's Penson and LEK accounts did not reflect any Leeward holdings. (See id. at ¶ 160; Kamar Decl. Ex. 4 at 272, 275). Nonetheless, Solomon

---

[9] As the Chief Operating Officer of Penson later testified, the issuance of account statements by an introducing broker, such as Windham, that did not hold client accounts "would raise some flags about the credibility of the statements." (Kamar Decl. Ex. 11 at 19).

advised Balaban in writing that he held "660,000 shares of Leeward." (Pl.'s Rule 56.1 Statement ¶ 162; Kamar Decl. Ex. 4 at 272-73). In addition, the total asset values set forth in the Windham account statements bore no relation to the true asset values of Balaban's Penson account. (See Kamar Decl. Ex. 4 at 267).

In late 2008, Balaban began expressing to Solomon his desire to begin cashing out his investments, but Solomon advised him that the Leeward transaction was "still in progress" and encouraged Balaban to remain patient. (See id. at 288-90). Balaban indicated that around September 2008, he began to have concerns about his investment with Windham, in part because he was unable to get in touch with Solomon, despite repeated attempts to do so. (Id. at Ex. 6 pp. 70-74, 81-82). On January 16, 2009, Balaban wrote to Solomon in an email, "Is there a reason I can't get a hold of you? I want my money now and not just $335,000 but the 2M. that was originally promised." (Pl.'s Rule 56.1 Statement ¶ 191). On January 26, 2009, Solomon wrote to Balaban indicating that he had resigned from Windham on January 12 and that Balaban's account would henceforth be handled by Constantin. (Id. at ¶¶ 193-94).

Balaban first spoke with Constantin on February 16, 2009. (Id. at ¶ 195). Over a series of subsequent conversations, Constantin advised Balaban that he was working to increase the value of Balaban's Leeward investment, which Constantin assured him could be expected to double in value. (Id. at ¶¶ 196-97). Constantin never told Balaban that his funds had been transferred to Constantin Resource and DAC, or that Balaban did not actually have any direct holdings in Leeward. (Id. at ¶ 198; Kamar Decl. Ex. 6 at 91). As of March 23, 2012, Balaban still had not recouped any of his investment in Windham. (Kamar Decl. Ex. 6 at 216).

**Mr. Mier**

Mr. Edward Mier first spoke with Solomon on June 2, 2008 about the possibility of making a short-term investment through Windham, to be completed by no later than the end of December 2008. (Id. at ¶¶ 201-02; Kamar Decl. Ex. 7 at 25-26). Solomon advised Mier that Windham had some investment opportunities available that could meet his needs, including an investment in Leeward, which Solomon indicated to Mier was a non-public company that would become public through a reverse merger. (Id. at ¶ 203). In their early discussions, Solomon also told Mier that, based on Windham's past performance, he could expect at

least a 30 percent return on his investment within one year.
(Id. at ¶ 204). Solomon subsequently encouraged Mier to consider
investing in the Leeward insurance company, advising him that
"in less than twelve months he would get his money back plus a
60 to 80 percent return." (Id. at ¶¶ 239-41).

Mier later remarked that he had been particularly impressed
by Windham's apparent ties to Europe, which he had presumed to
be significant, in light of Windham's internet presence based in
France, as well as Solomon's repeated references to his
involvement in the European markets. (See id. at ¶¶ 205-13).
Mier also inferred from Solomon's reference to Windham's
"investment banking division" and "trading floor" -- neither of
which actually existed -- that Windham was a large company. (See
Kamar Decl. Ex. 7 at 47, 234, 335-36). Solomon also advised Mier
that Windham had been involved in taking at least six private
companies public over the preceding year, a representation
which, as noted above, was entirely false. (Pl.'s Rule 56.1
Statement ¶¶ 214, 223-24; see supra, at 6).

On September 2, 2008, Mier wired a $250,000.00 initial
investment with Windham into his Penson account. (Pl.'s Rule
56.1 Statement ¶ 230). The next day, Constantin transferred
$25,000.00 from Mier's account to Windham's checking account,

17

representing Windham's ten-percent fee, of which half was then transferred to Solomon as his commission on the deal. (Id. at ¶¶ 232-33). Like Balaban, Mier reports that he had not been advised of Windham's ten-percent fee. (Kamar Decl. Ex. 7 at 68).

On September 5, 2008, Constantin transferred $224,926.94 from Mier's Penson account to the Leeward escrow account. (Pl.'s Rule 56.1 Statement ¶ 248). Later that day, Constantin received an email from an analyst at Penson asking him "the reasoning behind wiring in fund[s] early this week only to wire them back out," to which Constantin replied that Mier was "buying securities direct from the company, and they will be delivering back stock." (Id. at ¶¶ 250-251). On September 8, 2008, Constantin used $200,000.00 from the Leeward escrow account to purchase Leeward shares in the name of DAC. (Id. at ¶¶ 252-53).

On September 17, 2008, Mier deposited an additional $100,000.00 into his Penson account. (Id. at ¶ 236). Constantin transferred ten percent of this amount to Windham's checking account, again as Windham's ten-percent fee. (Id. at ¶ 237). In this case, Constantin paid Solomon his five percent commission via a payment from Constantin Resource. (Id. at ¶¶ 234, 238). On September 25, 2008, Constantin transferred $89,925.00 from Mier's Penson account to the Leeward escrow account (id. at ¶

254), and four days later transferred $160,000.00 --
constituting 94 percent of the funds in the Leeward escrow
account -- from the escrow account to Constantin Resource. (Id.
at ¶ 255). Although no Leeward stock had been purchased in
Mier's name, Solomon represented to Mier that he was invested in
Leeward. (Id. at ¶ 256).

On December 3, 2008, Mier met Constantin and Solomon for
lunch to discuss his account. (Id. at ¶ 264). At the lunch
meeting, Mier reiterated that he had intended for his investment
to be short-term and expressed a desire to liquidate at least
$70,000.00 to $100,000.00 of his Leeward holdings. (Id. at ¶¶
270, 272). According to Mier, Constantin and Solomon "clearly
suggest[ed] that there was an opportunity to get 70 to 100 back
as soon as possible" (Id. at ¶ 275), and Constantin allegedly
told Mier that he would provide Mier with an additional 10,000
shares of Leeward to make up for the fact that the Leeward deal
was apparently taking longer than had originally been
anticipated. (See id. at ¶¶ 271, 276). Nonetheless, Mier
apparently never received the $70,000.00 or the 10,000
additional Leeward shares that Constantin and Solomon had
promised to him on December 3, 2008. (Id. at ¶ 280; Kamar Decl.
Ex. 7 at 102-03). Mier notes that at his lunch meeting with
Constantin and Solomon, Constantin also indicated that he had

19

invested multiple millions of his own funds into the Leeward deal (see Kamar Decl. Ex. 7 at 85), which was not in fact the case. (See id. at Ex. 50).

Following Solomon's departure from Windham in January 2009, Mier began corresponding directly with Constantin about his account. (See Pl.'s Rule 56.1 Statement ¶¶ 281-283). In an email dated January 28, 2009 Mier noted, "[Solomon] sold me on an investment in Sept/Oct with over 30% gain by end Nov and ability to liquidate at that time." (Kamar Decl. Ex. 79 (all-caps omitted)). Constantin reassured him that he was "confident that [Leeward] is doing well and on track for a 30-60 day IPO." (Pl.'s Rule 56.1 Statement ¶ 284). Approximately seven months later, in August 2009, Mier contacted Penson to find out the status of his account and was told it "is closed and has a zero balance." (Id. at ¶¶ 285-87).

In January 2010, Constantin wrote to Mier in an effort to reassure him about the Leeward deal. Constantin provided Mier with significantly inflated numbers for the deal's expected returns, advising Mier that the book value for Leeward was in the range of $22 million to $33 million (Kamar Decl. Ex. 84 at 90), when the true numbers that Constantin had received from Leeward actually reflected a book value of $3 million to $4.5

million. (Id. at Ex. 84 at 85). Mier responded to Constantin's email, requesting documentary proof of his investment in Leeward (Pl.'s Rule 56.1 Statement ¶ 295), a request that he reiterated two days later in a phone call with Constantin. (Id. at ¶ 296).

On February 23, 2010, Constantin emailed Mier a document prepared to look like a Leeward promissory note. (Id. at ¶ 299). In fact, as Kevin Coughlin, the president of Leeward, later testified in his deposition, Leeward had never issued such a document. (Kamar Decl. Ex. 3 at 39). The purported note listed Solomon as Leeward's Loan Administrator, but as Coughlin explained, Solomon had never worked for Leeward (id. at 44-48), and as Solomon testified, the signature on the note did not match his own (id. at Ex. 5 p. 501), an assertion that is plainly supported by a visual comparison of the signature on the note with Solomon's true signature on various other documents. (Compare id. at Ex. 84 p. 29 with id. at Exs. 25, 88, 89). Moreover, the address listed on the note as Leeward's address was not, in fact, Leeward's address, but rather Constantin's business address. (Pl.'s Rule 56.1 Statement ¶ 303).

**Other Investors**

Besides Balaban and Mier, five other individuals invested funds with Windham for purposes of buying shares of Leeward.

On August 18, 2008, Solomon and Constantin directed LEK to transfer $55,076.34 from Mr. William Goldstein's account to the Leeward escrow account. (Kamar Decl. Ex. 90). The following day, Constantin transferred $55,000.00 from the escrow account to Constantin Resource. (Id. at Ex. 91).

Mr. Louis Esposito invested $50,000.00 on September 11, 2008 (id. at Ex. 50 p. 11), and Mr. Vincenzo Moreno invested $25,000.00 on September 16, 2008. (Id. at Ex. 50 p. 11). These funds were apparently all diverted to Constantin Resource that same month. (Id. at Ex. 50 p. 12). Mr. Piedad Zurita's March 18, 2009 investment was apparently transferred directly to Constantin's personal Citibank account the following day. (Id. at Ex. 50 p. 26).

In early 2009, Mr. James Thomas transferred a total of $20,000.00 into the Leeward escrow account, by way of two separate wire transfers. (Id. at Ex. 50 pp. 20, 23, Ex. 92, Ex. 93 p. 2). The day after each of Thomas's payments was wired into

22

the escrow account, Constantin transferred the funds to his personal checking account. (Id. at Ex. 50 pp. 20, 23).

## Regulatory Investigations

Around the fall of 2008, the Financial Industry Regulatory Authority ("FINRA") began investigating Windham. (Pl.'s Rule 56.1 Statement ¶ 332). Subsequently, in May 2010, the SEC began its own investigation of the company. (Id. at ¶ 336).

On May 28, 2010, shortly after Constantin received an SEC subpoena, the Leeward reverse merger finally went through, resulting in the issuance of 65 million shares of the resulting corporation, Leeward Group Holdings, Inc. (Id. at ¶¶ 336-37).

Following the merger, Balaban was issued shares pursuant to a purported "consultancy agreement," although he had never served as a consultant to any of the companies involved in the merger. (See id. at ¶ 342; Kamar Decl. Ex. 3 at 87). Windham's other clients who had invested in Leeward, including Mier, each received shares of Leeward Group Holdings from another shareholder, Charles Payne. (Pl.'s Rule 56.1 Statement at ¶ 341). Notably, the amounts of stock received by each of Windham's clients did not reflect the relative values of their

respective investments through Windham. (Id. at ¶¶ 343-46). In fact, several investors received approximately one quarter of the shares due to them, based on the relative amounts they had been led to believe they had invested in Leeward. (See id. at ¶¶ 343-44). The SEC argues that the distribution of these shares was intended by Constantin to cover up defendants' fraud, and should be regarded as a gift, rather than a return on clients' investments. (See Pl.'s Mem. 42-44).

As of June 28, 2012, Leeward Group Holdings' shares were trading at less than one cent per share. (Pl.'s Rule 56.1 Statement ¶ 349). As a result, in exchange for his investment of $660,000.00, Balaban received 3,080,000 shares of Leeward Group Holdings, valued at less than $30,800.00. In exchange for his investment of $300,000.00, Mier received 1.4 million shares of Leeward Group Holdings, valued at less than $14,000.00. Only one investor received a number of shares that came close to reflecting the value of his initial investment. (See id. at ¶ 347).

**This Lawsuit**

The SEC filed its complaint in this court on July 6, 2011. (Compl.). Each of defendants and relief defendants waived

24

service (see docket nos. 4, 5, 11, 12, 13) and initially appeared represented by counsel. On October 17, 2011, all parties consented to proceed under the jurisdiction of a magistrate judge, pursuant to 28 U.S.C. § 636(c). (Consent form, dated Oct. 17, 2011 (docket no. 16)). On March 8, 2012, counsel for defendant Solomon moved to withdraw, and the court granted that motion on March 19, 2012. (Endorsed Order, dated March 19, 2012 (docket no. 47)). Defendant Solomon has proceeded pro se, since that time.

As of the date of his deposition on April 20, 2012, Constantin invoked his Fifth Amendment privilege against self-incrimination. (Pl.'s Mem. at 44; Kamar Decl. Ex. 12). The discovery period closed June 18, 2012, and the SEC filed its motion for summary judgment on July 3, 2012. By endorsed order, we set the deadline for opposition to that motion as July 26, 2012. (Endorsed Order, dated July 5, 2012 (docket no. 55)). The court granted two separate extensions of the motion briefing schedule, the latest of which set the opposition deadline as September 24, 2012. (See Endorsed Orders, dated July 26, 2012 & Sept. 4, 2012 (docket nos. 56 & 57)). Nonetheless, defendants and relief defendants failed to file any opposition and, accordingly, on October 5, 2012 we deemed the motion closed to

further briefing. (See Endorsed Order, dated Oct. 5, 2012 (docket no. 58)).

## ANALYSIS

The SEC asserts claims against all defendants for violation of § 17(a) of the Securities Act, § 10(b) of the Exchange Act, and SEC Rule 10b-5 (Compl. 19-20), collectively known as the antifraud provisions of the securities laws. See, e.g., SEC v. Credit Bancorp, Ltd., 195 F. Supp. 2d 475, 490 (S.D.N.Y. 2002), recons. denied 2011 WL 5417106 (S.D.N.Y. Nov. 9, 2011). The SEC also argues in the alternative that, if Constantin is not deemed primarily liable under the antifraud provisions, he should be deemed secondarily liable based on a theory of control-person liability, under § 20(a) of the Exchange Act, or a theory of aiding and abetting violations of the Exchange Act. (Compl. at 21-23). Finally, the SEC seeks equitable relief against relief defendants Constantin Resource Group, Inc. and DAC. (Id. at 23). We understand this to include, at a minimum, the disgorgement of any ill-gotten gains that the relief defendants may have received from the principal defendants' alleged fraud.

## I. **Standard of Review**

Summary judgment will be granted when "the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(a). The movant bears the initial burden of informing the
court of the basis for its motion and identifying those portions
of the pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, that
demonstrate the absence of a genuine issue of material fact. See
Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317,
322 (1986). In making this judgment, the court must view all
evidence in the light most favorable to the non-moving party,
Overton v. N.Y. State Div. of Military & Naval Affairs, 373 F.3d
83, 89 (2d Cir. 2004), and must "resolve all ambiguities and
draw all permissible factual inferences in favor of the party
against whom summary judgment is sought." Sec. Ins. Co. of
Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d
Cir. 2004). "[A]ll doubts as to the existence of a genuine issue
for trial should be resolved against the moving party," Brady v.
Town of Colchester, 863 F.2d 205, 210 (2d Cir. 1988) (citing
Celotex, 477 U.S. at 330 n. 2), but "[o]nly disputes over facts
that might affect the outcome of the suit under the governing
law will properly preclude the entry of summary judgment[;]

27

[f]actual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 447 U.S. 242, 248 (1986).

If the non-moving party has the burden of proof as to a particular issue, the movant may satisfy its initial burden by demonstrating the absence of evidence supporting an essential element of the non-moving party's claim. See, e.g., Repp v. Webber, 132 F.3d 882, 890 (2d Cir. 1997); Gummo v. Vill. of Depew, 75 F.3d 98, 107 (2d Cir. 1996). If the movant fails to meet its initial burden, the motion will fail even if the opponent does not submit any evidentiary matter to establish a genuine factual issue for trial. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 160 (1970); Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004); Amaker v. Foley, 274 F.3d 677, 681 (2d Cir. 2001); BBS Norwalk One, Inc. v. Raccolta, Inc., 117 F.3d 674, 677-78 (2d Cir. 1997). In other words, the non-moving party is not required to defend itself against "an insufficient showing." Amaker, 274 F.3d at 681 (quoting Adickes, 398 U.S. at 161). If, however, the movant satisfies its initial burden, the burden then shifts to the opposing party to demonstrate that there is a genuine dispute of material fact. See Celotex, 477 U.S. at 323; L & L Started Pullets, Inc. v. Gourdine, 762 F.2d 1, 4 (2d Cir. 1985). The

non-movant may not simply rest on the allegations set forth in its pleading, but rather must submit "significant probative evidence tending to support" those allegations. Anderson, 477 U.S. at 249. In addition, under Local Rule 56.1(c), all material facts set forth in a moving party's Rule 56.1 statement that are uncontroverted are deemed to be admitted by the opposing party.

## II.  Antifraud Provisions of the Securities Laws

The elements of a claim under § 17(a) of the Securities Act, and under § 10(b) of the Exchange Act and SEC Rule 10b-5 are "[e]ssentially the same," SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999), and "[m]any courts -- including the Second Circuit -- analyze claims under both statutes together."[10] SEC v. ICP Asset Mgmt., LLC, 2012 WL 2359830, at *2 (S.D.N.Y. 2012).

---

[10]  The few distinctions that do exist between the antifraud provisions -- for example, the fact that there is no private cause of action under Section 17(a) of the Securities Act, Finkel v. Stratton Corp., 962 F.2d 169, 175 (2d Cir. 1992), and the fact that Section 17(a) of the Securities Act covers the "offer or sale" of securities, 15 U.S.C. § 77q, while Section 10(b) of the Exchange Act and SEC Rule 10b-5 cover the "purchase or sale" of securities, 15 U.S.C. § 78j(b), 17 C.F.R. 240.10b-5 -- are not relevant to this case, in which the SEC is asserting claims premised on fraudulent conduct in connection with the sale of securities.

To prevail on each of its claims under § 10(b) of the Exchange Act and SEC Rule 10b-5, the SEC must establish that, in connection with the purchase or sale of securities in a domestic transaction, the defendants acted with scienter, and by means of instrumentalities of interstate commerce, in employing a fraudulent device or in making a material misrepresentation or a material omission as to which they had a duty to speak. See Monarch Funding Corp., 192 F.3d at 308; SEC v. Tourre, 2012 WL 5838794, at *2 (S.D.N.Y. Nov. 19, 2012) (quoting Morrison v. Nat'l Australia Bank Ltd., 130 S.Ct. 2869, 2884 (2010)); United States v. Teyibo, 877 F. Supp. 846, 861 (S.D.N.Y. 1995), aff'd, 101 F.3d 681 (2d Cir. 1996). To prevail on its claims under sub-sections 17(a)(2) and 17(a)(3) of the Securities Act, the SEC must demonstrate all of the same elements, except that it need not prove that defendants acted with scienter. See Aaron v. SEC, 446 U.S. 680, 695-96 (1980).

Notably, "[t]he SEC does not need to prove investor reliance, loss causation, or damages" to prevail on any of its claims for primary liability under the securities laws. Credit Bancorp, 195 F. Supp. 2d at 490-91.

## III. **Assessment of Plaintiff's Motion**

### A. Liability

#### 1. Conduct in Connection with Purchase or Sale of Securities

To constitute securities fraud, the alleged misconduct must be in connection with the offer, purchase, or sale of securities. 15 U.S.C. § 77q(a) ("offer or sale"); 15 U.S.C. § 78j(b) ("purchase or sale"); 17 C.F.R. 240.10b-5 ("purchase or sale"). Courts are directed to construe this requirement "broadly so as to encompass fraud in any part of the selling process." SEC v. Mudd, 885 F. Supp. 2d 654, 670 (S.D.N.Y. 2012) (quoting SEC v. Brown, 740 F. Supp. 2d 148, 164 (D.D.C. 2010)). As the Supreme Court has noted, "it is enough that the fraud alleged 'coincide' with a securities transaction." Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 85, (2006) (citing United States v. O'Hagan, 521 U.S. 642, 651 (1997)). In addition, as the Supreme Court held in Morrison v. Nat'l Australia Bank Ltd., the antifraud provisions of the Securities Act and the Exchange Act apply only to domestic securities transactions -- that is, those involving a purchase or sale within the United States. 130 S.Ct. at 2884-85.

31

The Securities Act and the Exchange Act both define "security" to include, <u>inter alia</u>, "any note, stock, treasury stock, security future, security-based swap, bond, [or] debenture," but not a note with a maturity of less than nine months from the date of issuance, except where the "context otherwise requires." <u>See</u> 15 U.S.C. §§ 77b(a)(1), 77c(a)(3), 78c(a)(10).

According to the Supreme Court, while the sale of stock in a corporation "is typical of the kind of context to which the [Securities and Exchange] Acts normally apply," <u>Landreth Timber Co. v. Landreth</u>, 471 U.S. 681, 687 (1985),

> the fact that instruments bear the label "stock" is not of itself sufficient to invoke the coverage of the Acts. Rather, we concluded that we must also determine whether those instruments possess "some of the significant characteristics typically associated with" stock… We identified those characteristics usually associated with common stock as (i) the right to receive dividends contingent upon an apportionment of profits; (ii) negotiability; (iii) the ability to be pledged or hypothecated; (iv) the conferring of voting rights in proportion to the number of shares owned; and (v) the capacity to appreciate in value.

<u>Id.</u> at 686 (internal cites omitted).

32

In this case, defendants Solomon and Constantin encouraged their clients to invest through Windham in the purchase of stock from Omega World, a publicly traded American company, and in Leeward Insurance, a private American company. (See Kamar Decl. Ex. 2 at 60, 63). This conduct alone is sufficient to constitute conduct "in connection with" the purchase of securities. See SEC v. Shehyn, 2010 WL 3290977, at *5 (S.D.N.Y. Aug. 9, 2010) (efforts to sell pre-IPO stock in private companies is conduct in connection with the sale of securities). The fact that Windham's clients did not initially receive stock in exchange for their funds (though they did, long after they had made their investments, receive some Leeward Group Holdings stock, apparently with little relation to the amounts each client had invested) is immaterial, since the "purported buying and selling of securities is itself sufficient to satisfy the 'in connection with' requirement." In re J.P. Jeanneret Assocs., Inc., 769 F. Supp. 2d 340, 361-63 (S.D.N.Y. 2011).

The fact that Windham purported to invest client funds in the purchase of Leeward convertible promissory notes (see, e.g., Kamar Decl. Ex. 1 at 250) does not undermine our conclusion that defendants' conduct was "in connection with the sale of securities." Several courts applying the "family resemblance test" that was adopted by the Supreme Court in Reves v. Ernst &

Young, 494 U.S. 56, 64-65 (1990),[11] have held that when a convertible note is acquired ostensibly for investment purposes, the note should be considered a security. See, e.g., Intelligent Digital Sys., LLC v. Visual Mgmt. Sys., Inc., 683 F. Supp. 2d 278, 284 (E.D.N.Y. 2010); Leemon v. Burns, 175 F. Supp. 2d 551, 559 (S.D.N.Y. 2001) ("The fact that the Note's original principal could be converted into… common stock is a strong factor for holding that the Note is a security.").

In this case, Windham's clients were motivated by a desire to invest their funds for a profitable return and were led to reasonably believe that they had indeed invested in Leeward

---

[11] Under the family-resemblance test, the court first considers whether the note is functionally similar to any of the following non-securities: "[a] note delivered in consumer financing, [a] note secured by a mortgage on a home, [a] short-term note secured by a lien on a small business or some of its assets, [a] note evidencing a 'character loan' to a bank customer, short-term notes secured by an assignment of accounts receivable, ... a note which simply formalizes an open-account debt incurred in the ordinary course of business.... [and] notes evidencing loans by commercial banks for current operations." Reves, 494 U.S. at 65. "If the note is not sufficiently similar to one of the non-security instruments, then we must determine whether another category of such instruments should be judicially created by reference to the same four factors, identified in Reves as follows: (1) the motivations that would prompt a reasonable buyer and seller to enter into the transaction; (2) the plan of distribution of the instrument; (3) the reasonable expectations of the investing public; and (4) whether some factor, such as the existence of another regulatory scheme, significantly reduces the risk of the instrument, thereby rendering application of the securities laws unnecessary." Pollack v. Laidlaw Holdings, Inc., 27 F.3d 808, 811-12 (2d Cir. 1994).

securities. For this reason, we conclude that, under the <u>Reves</u> test, the purported purchase of Leeward promissory notes was "in connection with" the sale of securities. In addition, we note that the blatantly fraudulent "note" that Constantin sent to Mier, which indicated a maturity date of 60 months -- <u>i.e.</u>, in excess of nine months -- clearly falls within the statutory definition of a security. 15 U.S.C. §§ 77b(a)(1), 77c(a)(3), 78c(a)(10); 17 C.F.R. 240.10b-5. Moreover, we have little doubt that even if the maturity date of this fraudulent document had been stated as less than nine months, it would not have protected defendants from the reach of the antifraud provisions of the federal securities statutes. <u>See</u> <u>Zeller v. Bogue Elec.</u> <u>Mfg. Corp.</u>, 476 F.2d 795, 800 (2d Cir. 1973) ("the mere fact that a note has a maturity of less than nine months does not take the case out of Rule 10b-5, unless the note fits the general notion of 'commercial paper'").

## 2. Interstate Commerce

"The jurisdictional requirements of Sections 17(a) and 10(b) and Rule 10b-5 are broadly construed, so as to be satisfied by any activity connected with a national securities exchange, by intrastate telephone calls, and by even the most ancillary mailings." <u>SEC v. Softpoint, Inc.</u>, 958 F. Supp. 846,

865 (S.D.N.Y. 1997), aff'd, 159 F.3d 1348 (2d Cir. 1998). In this case, defendants' use of email and wire transfers in connection with the sale of securities is sufficient to bring their conduct within the jurisdictional scope of the federal securities laws. See SEC v. Ramoil Mgmt., Ltd, 2007 WL 3146943, at *8 (S.D.N.Y. Oct. 25, 2007); Softpoint, Inc., 958 F. Supp. at 861, 865.

### 3. Material Misrepresentation, Omission, or Fraudulent Device

Section 17(a) of the Securities Act and § 10(b) of the Exchange Act, and SEC Rule 10b-5 "expressly prohibit misstatements and omissions as to facts that are material." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1466 (2d Cir. 1996). "In the case of an omission, the duty to disclose generally 'arises when one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'" Grandon v. Merrill Lynch & Co., Inc., 147 F.3d 184, 189 (2d Cir. 1998) (quoting Chiarella v. United States, 445 U.S. 222, 228 (1980)). While the Second Circuit has held that there "is no general fiduciary duty inherent in an ordinary broker/customer relationship," it has recognized that a fiduciary relationship may be formed when the client has entrusted the broker with

36

certain matters, as "in situations in which a broker has discretionary authority over the customer's account." United States v. Wolfson, 642 F.3d 293, 295 (2d Cir. 2011) (internal cites and quotations omitted) (emphasis in original). In such situations, brokers have "an affirmative duty… to use reasonable efforts to give [customers] information relevant to the affairs that have been entrusted to them." United States v. Szur, 289 F.3d 200, 211 (2d Cir. 2002) (internal quotes and citations omitted) (original brackets omitted). Thus, the distinction between omissions and misrepresentations becomes "illusory in the context of a broker who has a fiduciary duty to h[is] clients." SEC v. Zandford, 535 U.S. 813, 823 (2002).

Because the evidence demonstrates that Windham's clients had entrusted defendants with discretionary control over their accounts and investments (see, e.g., Kamar Decl. Ex. 6 at 41-49 (Balaban indicates that he trusted Solomon to handle his accounts, which he had been led to believe were held at Windham), Ex. 41 (authorization form sent to client by Solomon), Ex. 50 at 23, 26 (Constantin transfers all client funds that were in escrow to his personal checking account)), we conclude that defendants entered into fiduciary relationships with their clients, see Wolfson, 642 F.3d at 295 ("the presence of a discretionary account automatically implies a general fiduciary

37

duty between a broker and customer"), which affirmatively obligated them to disclose to their clients all material information relevant the clients' Windham investments. Szur, 289 F.3d at 211. In any event, the uncontroverted evidence reflects that the defendants engaged in frequent sweeping affirmative misrepresentations, which may trigger liability absent a fiduciary responsibility. See, e.g., Novak v. Kasaks, 216 F.3d 300, 315 (2d Cir. 2000).

"Summary judgment on matters of materiality in a securities fraud case is appropriate when the omissions and misrepresentations in question are 'so obviously important to the investor, that reasonable minds cannot differ on the question of materiality.'" Credit Bancorp, 195 F. Supp. 2d at 492 (quoting SEC v. Research Automation Corp., 585 F.2d 31, 35 (2d Cir. 1978)). "The materiality of an item of information is a mixed question of law and fact," which depends on whether the information is deemed relevant in light of controlling substantive law and would likely be given weight by the reasonable investor. Id. The relevant inquiry is whether the misrepresentation or omission would have "significantly altered the 'total' mix of information available" to the reasonable investor. First Jersey Sec., Inc., 101 F.3d at 1466 (quoting In

38

re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267-68 (2d Cir. 1993) (internal quotes omitted)).

The litany of misrepresentations that Solomon and Constantin made to their clients is striking. They misrepresented their respective educational backgrounds. (See, e.g., Kamar Decl. Ex. 4 at 190-91, Ex. 15). Solomon, in particular, overstated his own professional experience (see, e.g., id. at Ex. 6 p. 17, Ex. 46, Ex. 70), and that of Windham (see id. at Ex. 70), in order to foster a false sense of confidence among potential clients. In speaking with clients, Solomon routinely made reference to company divisions that did not exist (see, e.g., id. at Ex. 7 pp. 47, 243, 335-36), and to his active involvement in European deals that also did not exist. (Id. at Exs. 46, 70). Constantin similarly tried to bolster Windham's image as a large, international company by establishing Windham's internet presence under a French domain name (see, e.g., id. at Ex. 9 p. 153), and by advertising numerous office locations in expensive metropolitan locations where Windham did not actually maintain active offices. (See, e.g., id. at Ex. 9 pp. 114-116). Solomon expressly told clients that they could anticipate returns on their investments ranging from 200 to 500 percent (see, e.g., id. at Ex. 34), although he later acknowledged that he had no basis for such optimistic

projections. (Id. at Ex. 5 pp. 526, 532). And when Constantin began corresponding with Solomon's former clients, he omitted to correct those misrepresentations that Solomon had explicitly made to those clients. (See, e.g., Pl.'s Rule 56.1 Statement ¶ 198).

When clients invested funds in Windham, they were hit with a ten-percent advisory fee that had not previously been disclosed to them. (See, e.g., Kamar Decl. Ex. 7 at 68).[12] After several clients had invested funds with Windham for purposes of purchasing stock in Leeward, Constantin diverted those funds to his own purposes. He apparently diverted $643,000.00 of client funds to Constantin Resource, which he used to pay personal and business expenses (Pl.'s Rule 56.1 Statement ¶ 329), $450,000.00 to Leeward for the purchase of stock in the name of DAC (id. at ¶ 330), and additional amounts to Windham's corporate checking

---

[12] We have been unable to locate any cases in which a broker-dealer's fee was charged, as it was by defendants, as a percentage of clients' up-front investment, rather than as a markup on the sale price of securities. However, we believe that defendants' ten-percent fee off the top of clients' investments can be fairly analogized to a ten-percent markup on the price of all of Windham's transactions, and we note that "a broker-dealer who charges customers retail prices that include an undisclosed, excessive markup violates § 17(a) and § 10(b) of the securities laws." First Jersey Sec., Inc., 101 F.3d at 1469; see also Grandon, 147 F.3d at 191 (although reasonableness of a broker's markup is a fact-specific inquiry, "[i]t appears to be agreed that markups for equity securities generally should not exceed five percent of the prevailing market price.").

account. (Id. at ¶ 329; see also Kamar Decl. Ex. 1 at 35-36 (Constantin testified that he didn't keep track of individual clients' funds that went into the Leeward escrow account)).

Clients who had been reassured by Solomon that they could make short-term investments that could be liquidated after only a few months later found that they were unable to recover their funds even after several years. (See, e.g., id. at Ex. 79). In addition, both Solomon and Constantin provided clients with misleading documents to cover up the fraudulent nature of their investment scheme. In the case of Balaban, Solomon and Constantin prepared monthly account statements that misleadingly represented Leeward holdings that Balaban did not actually have. (See id. at Ex. 40). The account statements also set forth fictitious account values, which misled Balaban concerning the true value of his investment through Windham. (Id. at Ex. 6 pp. 64-66). Similarly, in the case of Mier, Constantin produced a fake promissory note in an effort to convince Mier that his investment in Leeward was secure when, in fact, it was not. (See id. at Ex. 87).

This long list of patently misleading conduct, which was carried out between 2008 and 2010, is, we note, non-exhaustive. There can be no doubt that these misrepresentations --

41

individually and collectively -- were material and would have affected the reasonable investor's choice whether to invest in securities through Windham. See, e.g., Zandford, 535 U.S. at 819; Research Automation Corp., 585 F.2d at 35 ("What reasonable investor would not wish to know that the money raised by stock sales would not be used for working capital but be diverted to [the company's] officers?"); United States v. Finnerty, 474 F. Supp. 2d 530, 543 (S.D.N.Y. 2007) ("theft constitutes securities fraud only when it is accompanied by a violation of a fiduciary duty."), aff'd, 533 F.3d 143 (2d Cir. 2008); U.S. Commodity Futures Trading Comm'n v. Rolando, 589 F. Supp. 2d 159, 170 (D. Conn. 2008) ("a reasonable investor would want to know that his account statements were false and that… [defendant] provided false contact information to [] prevent the customer from receiving account statements and other communications"); Lapin v. Goldman Sachs Group, Inc., 506 F. Supp. 2d 221, 239 (S.D.N.Y. 2006) ("optimistic statements may be actionable upon a showing that the defendants did not genuinely or reasonably believe the positive opinions they touted (i.e., the opinion was without a basis in fact or the speakers were aware of facts undermining the positive statements), or that the opinions imply certainty."); SEC v. Gallard, 1997 WL 767570, at *3 (S.D.N.Y. Dec. 10, 1997) ("[T]here is no question a reasonable investor would consider important the fact that the 'security' at issue

did not exist… and that the money paid for those securities would be misappropriated."); Marbury Mgmt., Inc. v. Kohn, 470 F. Supp. 509, 513 (S.D.N.Y. 1979) (false statements concerning professional expertise in the securities field qualified as securities fraud), rev'd in part on other grounds, 629 F.2d 705 (2d Cir. 1980); SEC v. Wills, 472 F. Supp. 1250, 1263 (D.D.C. 1978) (actual or constructive knowledge that book value is overstated constitutes grounds for liability).

Taken as a whole, defendants' efforts to lure clients to Windham through false promises about expected returns on investment and about Windham's professional experience; Constantin's misappropriation of client funds, which he diverted to Constantin Resource, DAC, and Windham; Solomon's and Constantin's efforts to mislead clients about their actual account holdings with, among other things, phony account statements; and their distribution of Leeward Group Holdings stock to clients in random amounts not proportionate with clients' respective investments in Leeward, in an apparent effort to cover up defendants' misconduct, all suggest the existence of a wide-sweeping fraudulent investment scheme. See, e.g., SEC v. Kelly, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011) ("Scheme liability under subsections (a) and (c) of Rule 10b-5 hinges on the performance of an inherently deceptive act that is

distinct from an alleged misstatement."); In re Smith Barney Transfer Agent Litig., 884 F. Supp. 2d 152, 161 (S.D.N.Y. 2012) (citing WPP Lux. Gamma Three Sarl v. Spot Runner, Inc., 655 F.3d 1039, 1057 (9th Cir. 2011); Pub. Pension Fund Grp. v. KV Pharm. Co., 679 F.3d 972, 987 (8th Cir. 2012)).

## 4. Scienter[13]

Although "[i]ssues of motive and intent are usually inappropriate for disposition on summary judgment," Wechsler v. Steinberg, 733 F.2d 1054, 1058 (2d Cir. 1984), "the district courts should not hesitate to grant a plaintiff's request for summary judgment when the defendant has failed to meet the requirements prescribed by Rule 56(e)." Research Automation Corp., 585 F.2d at 33-34.

"Scienter, as used in connection with the securities fraud statutes, means intent to deceive, manipulate, or defraud, or at least knowing misconduct." First Jersey Sec., Inc., 101 F.3d at 1467 (citing, inter alia, Ernst & Ernst v. Hochfelder, 425 U.S.

---

[13] As noted above, the SEC need only establish scienter with respect to its claims under § 10(b) of the Exchange Act, SEC Rule 10b-5, and sub-section 17(a)(1) of the Securities Act, and it need not establish scienter to prove its claims under sub-sections 17(a)(2) and 17(a)(3) of the Securities Act. See Aaron, 446 U.S. at 696-97.

185, 193 n. 12 (1976)). To prove scienter, "it is sufficient to show that the defendant 'intentionally engaged' in 'manipulative conduct.'" AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202, 221 (2d Cir. 2000) (quoting SEC v. U.S. Envtl., Inc., 155 F.3d 107, 111 (2d Cir. 1998)). "Representing information as true while knowing it is not, recklessly misstating information, or asserting an opinion on grounds so flimsy as to belie any genuine belief in its truth, are all circumstances sufficient to support a conclusion of scienter." SEC v. Universal Exp., Inc., 475 F. Supp. 2d 412, 424 (S.D.N.Y. 2007), aff'd sub nom. SEC v. Altomare, 300 F. App'x 70 (2d Cir. 2008). With respect to a corporate defendant, "a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation." Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195 (2d Cir. 2008).

It is apparent from the record that Constantin and Solomon each acted knowingly and intentionally to mislead and defraud their clients.[14] The record shows that Solomon routinely lied to

---

[14]   In light of Constantin's invocation of his Fifth Amendment right as of April 20, 2012, plaintiff encourages the court to adopt an adverse inference as to Constantin's state of mind. (See Pl.'s Mem. 50). While it is true that, in a civil

clients about Windham's investment experience, its size and involvement in international markets, and the amount of return that clients could expect from their investments with Windham. Solomon admits that he prepared account statements for clients that reflected information that he knew to be untrue at the time that he prepared them. (See Kamar Decl. Ex. 4 at 272, 275). To the extent that Solomon did not have direct knowledge of the falsity of some of the information that Constantin directed him to include in the manufactured account statements, we conclude that he acted recklessly in failing to verify the accuracy of the information. See, e.g., Rolf v. Blyth, Eastman Dillon & Co., Inc., 570 F.2d 38, 45 (2d Cir. 1978), amended 1978 WL 4098 (2d Cir. May 22, 1978) ("there is general agreement that [the required intent to mislead] is present when the representation

---

action, "[a] party who asserts the privilege against self-incrimination must bear the consequence of lack of evidence, and the claim of privilege will not prevent an adverse finding or even summary judgment," United States ex rel. Bilokumsky v. Tod, 263 U.S. 149, 153-54 (1991); see Wechsler v. Hunt Health Sys., Ltd., 2003 WL 21998980, at *2 (S.D.N.Y. Aug. 22, 2003), we believe that the record in this case provides ample circumstantial evidence from which to infer Constantin's state of mind without the need to adopt an adverse inference against him. See Herman & MacLean v. Huddleston, 459 U.S. 375, 390 n. 30 (1983). Nonetheless, we note that to the extent that Constantin's invocation of the Fifth Amendment precludes him from presenting testimony as to his state of mind, see United States v. Inc. Vill. of Island Park, 888 F. Supp. 419, 431 (E.D.N.Y. 1995), that issue is appropriately dealt with at the summary judgment stage. See United States v. Certain Real Prop. & Premises Known as 4003-4005 5th Ave., Brooklyn, N.Y., 55 F.3d 78, 81 (2d Cir. 1995) (citing United States v. 4003-4005 Fifth Ave., 855 F. Supp. 50, 54-55 (E.D.N.Y.1994)).

is made without any belief as to its truth, or with reckless disregard whether it be true or false."). Solomon had access to, and regularly reviewed, his clients' accounts online (Kamar Decl. Ex. 4 at 144-46), and thus must have been aware that Constantin had transferred funds out of client accounts and had not transferred security holdings or other assets into the accounts. Thus, we conclude that the circumstantial evidence strongly suggests that Solomon acted with the requisite scienter to find him liable.

As to Constantin's state of mind, we find that the circumstantial evidence strongly suggests that he acted intentionally to defraud Windham's clients. In particular, we note that he directed Solomon to send clients account statements that he knew did not reflect clients' true investment holdings, that he manufactured a fake promissory note to send to Mier, that he told Mier that Leeward's book value was more than seven times the value that he knew it to be, and that he diverted client funds to his own use; all of this lends support to the conclusion that Constantin acted knowingly.

Because Solomon and Constantin were essentially Windham's only two employees during the relevant period, from 2008 to

2010, their knowing and intentional misconduct is clearly attributable to Windham, the corporate defendant.

In sum, we conclude that it is beyond triable dispute that all three named defendants are primarily liable for securities fraud under § 17(a) of the Securities Act, and under § 10(b) of the Exchange Act and SEC Rule 10b-5.[15]

### B. Remedies

As relief, the SEC requests (i) that defendants be permanently enjoined from future violations of § 17(a) of the Securities Act, § 10(b) of the Exchange Act, and SEC Rule 10b-5; (ii) that defendants be ordered to disgorge all ill-gotten gains; and (iii) that they be ordered to pay the maximum amount in civil penalties. The SEC further requests that relief defendants be ordered to disgorge all amounts that they received as a result of defendants' fraudulent misconduct. (See Pl.'s Mem. 65).

---

[15] Having concluded that Constantin is primarily liable for securities fraud, we decline to address plaintiff's alternative claims against him, alleging secondary liability premised on control-person liability or aiding and abetting violations of the Exchange Act.

## 1. Injunctive Relief

"[C]ourts in this district have granted permanent injunctive relief on an SEC motion for summary judgment where the fraud scheme at issue was broad in scope, long in duration, and involved a high degree of scienter." SEC v. Svoboda, 409 F. Supp. 2d 331, 343 (S.D.N.Y. 2006) (citing cases). All of these factors are clearly present in this case.

The most "critical question for a district court in deciding whether to issue a permanent injunction in view of past violations is whether there is a reasonable likelihood that the wrong will be repeated." SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1100 (2d Cir. 1972). "In determining whether there is a realistic likelihood that a defendant will violate the securities laws in the future, courts look to a number of factors: (1) the degree of scienter involved; (2) the isolated or persistent nature of the past fraudulent acts; (3) the defendant's appreciation of his wrongdoing; and (4) the defendant's opportunities to commit future violations." SEC v. Opulentica, LLC, 479 F. Supp. 2d 319, 329 (S.D.N.Y. 2007).

In this case, where all members of the corporation were engaged in egregious misconduct and ongoing fraud -- indeed,

49

where the entire seeming purpose of the organization was to draw in unsuspecting clients and to take their funds -- we conclude that a permanent injunction to prevent future violations is obviously warranted.

## 2. **Civil Penalties**

"Section 20(d) of the Securities Act and Section 21(d)(3)(B) of the Exchange Act outline three categories -- referred to as 'tiers' -- of civil penalties. Although each tier establishes a maximum penalty per violation, the amount of any civil penalty rests squarely in the discretion of the court." Universal Exp., Inc., 646 F. Supp. 2d at 567. The court may impose third-tier civil penalties for any violation of the Act involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" that "resulted in substantial losses or created a significant risk of substantial losses." 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d). With respect to natural persons, the court may impose a third-tier penalty of either $100,000.00 for each violation, or the gross amount of his or her pecuniary gain resulting from the violation, whichever is greater. With respect to non-natural persons, the court may impose a third-tier penalty of either $500,000.00 for each violation, or the gross amount of his or

her pecuniary gain resulting from the violation, whichever is greater. 15 U.S.C. § 77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B)(iii).

"In determining whether civil penalties should be imposed, and the amount of the fine, courts look to a number of factors, including (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." SEC v. Milligan, 436 F. App'x 1, 3 (2d Cir. 2011) (quoting SEC v. Haligiannis, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007)). "While these factors are helpful in characterizing a particular defendant's actions, the civil penalty framework is of a 'discretionary nature' and each case 'has its own particular facts and circumstances which determine the appropriate penalty to be imposed.'" Opulentica, LLC, 479 F. Supp. 2d at 331 (quoting Moran, 944 F. Supp. at 296-97).

There is no question that the conduct of all three of the defendants involved "fraud, deceit, manipulation, [and] deliberate or reckless disregard" of the securities laws, and

51

that their misconduct resulted in significant financial losses by their clients. Accordingly, we conclude that each of the defendants should be subjected to third-tier civil penalties under the Securities Act and the Exchange Act. However, as explained below, we postpone our determination of the amounts of civil penalties that each defendant must pay until after the court has received supplemental submissions from the parties.

### 3. Disgorgement

Federal courts have the power to direct disgorgement of ill-gotten gains to "prevent wrongdoers from unjustly enriching themselves through violations" of the securities laws. SEC v. Cavanagh, 445 F.3d 105, 117 (2d Cir. 2011). In this case, where defendants misappropriated large amounts of client funds, we conclude that disgorgement is undoubtedly appropriate. However, supplemental submissions are required to more clearly explain the parties' calculations as to the appropriate amount of disgorgement.

### 4. Relief Defendants

"District courts may only require disgorgement of the assets of a relief defendant upon a finding that [it] lacks a

'legitimate claim'" to the assets. Commodity Futures Trading Comm'n v. Walsh, 618 F.3d 218, 226 (2d Cir. 2010). A relief defendant does not have a legitimate claim to assets that it has received as a gift, without payment of consideration. Id. In contrast, a good-faith purchaser for value may not be ordered to disgorge assets originating from a defendant's ill-gotten gains. Id. at 227.

Constantin Resource is Constantin's company through which he allegedly conducts some independent financial consulting work. (Kamar Decl. Ex. 1 at 28). He apparently is the sole owner of the company, serves as its sole officer and employee (see Kamar Decl. Ex. 1 at 21), and is the only authorized signatory on the company's account. (Id. at Ex. 2; Ex. 52).

Given Constantin's role as the sole owner and employee of Constantin Resource, it is apparent that Constantin Resource could not have received the ill-gotten funds from Windham in good faith, since Constantin's personal knowledge is fairly attributed to his corporation, Constantin Resource. Indeed, Solomon testified that Constantin used Constantin Resource as his personal "slush fund," noting that "[i]f we went out drinking, the debit card said Constantin Resource Group on it" and that loans that Constantin made to Solomon also came through

Constantin Resource. (Kamar Decl. Ex. 2 at 49-50; see also Ex. 52 (Constantin Resource debit account records)).

It is unclear from the record exactly what position Constantin held at DAC during the relevant period. He was, as of April 2008, a member of the board (Ex. 21 p. 21-4), and at some point between April 2008 and May 2010, Constantin took over as CEO of DAC. (See Ex. 95 p. 95-11). His ties to the company suggest at least some basis for arguing that his knowledge as to the illicit source of funds that DAC received from Windham should be attributed to DAC. We believe that it is sufficient, however, to require DAC to disgorge the assets that it acquired from defendants' misconduct on the basis that the record does not support, and DAC has not submitted any evidence to suggest, that the company paid adequate consideration for its receipt of those funds. See SEC v. China Energy Sav. Tech., Inc., 636 F. Supp. 2d 199, 204 (E.D.N.Y. 2009). Accordingly, we conclude that both relief defendants will be required to disgorge those assets that each has received as ill-gotten gains of defendants' misconduct.

5. **The Required Supplementation**

The discussion of disgorgement in the SEC's memorandum of law involves a relatively long, winding path of internal cross-references. (See, e.g., Pl.'s Mem. 67-68 (referring reader to pp. 40-42, which in turn directs reader to Parts III.A.3, II.A.5, III.B.1, III.B.3, and III.C)). The court's confusion in calculating defendants' and relief defendants' ill-gotten gains is further exacerbated by the fact that some of the account statements provided as evidence are not clearly legible (see, e.g., Kamar Decl. Ex. 20 pp. 3-12) and by the fact that, without a detailed explanation of the flow of funds into the Leeward escrow account, it is difficult to determine which fund transfers leaving the account should be deemed to have been fraudulent. (See id. Ex. 50).

With respect to the amounts DAC allegedly received as a result of defendants' misconduct, the SEC points to DAC's stock-purchase agreement with Leeward as evidence that the full amount of that stock purchase derived from defendants' fraud on Windham clients. (See Pl.'s Mem. 41 (citing Kamar Decl. Exs. 22 & 94) & 70). However, without evidence that DAC did not contribute any of its own funds to the stock purchase, it is difficult to conclude that the full $450,000.00 value of the stock purchase

agreement was taken from Windham clients. In its supplemental briefing, the SEC should more clearly explain its rationale -- including reference to supporting evidence -- for concluding that the full $450,000.00 stock purchase in DAC's name was funded by defendants' misconduct.

In sum, the SEC's supplemental submission should provide a clear explanation of the flow of funds from defrauded clients to each defendant and relief defendant, including direct references to supporting evidence. It should also include an explanation of its calculations of any prejudgment interest. Finally, if possible and where appropriate, the SEC should include more legible copies of its supporting evidence.

**CONCLUSION**

For the foregoing reasons, summary judgment is granted in full against all defendants and relief defendants. Defendants are hereby permanently enjoined from future violations of § 17(a) of the Securities Act, § 10(b) of the Exchange Act, and SEC Rule 10b-5. In addition, defendants and relief defendants will be ordered to disgorge all ill-gotten gains arising from defendants' violations, and each defendant will be required to pay civil penalties in amounts to be determined.

The amounts that each defendant and relief defendant will be directed to pay will be determined following additional submissions by the parties. The SEC shall file its submission by no later than April 15, 2013. Defendants' opposition, if any is due by April 18, 2013, and the SEC's reply is due by April 22, 2013.


DATED:     New York, New York
           April 2, 2013


_____
MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE




Copies of the foregoing Memorandum and Order have been sent today to:

Preethi Krishnamurthy, Esq.
George S. Canellos, Esq.
Barry Antoine Kamar, Esq.
Wendy Beth Tepperman, Esq.
U.S. Securities and Exchange Commission
Three World Financial Center
New York, NY 10281

James Kousouros, Esq.
Law Office of James Kousouros, Esq.
260 Madison Avenue, 22 Floor
New York, NY 10016

Mr. Brian Solomon
bsolomon@solomonkeegan.com